*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0068P (6th Cir.)
File Name: 00a0068p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BALANCE DYNAMICS
CORPORATION,
     *Plaintiff-Appellant,*

    *v.*

SCHMITT INDUSTRIES,
INCORPORATED,
     *Defendant-Appellee.*



No. 97-2023

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 94-75356—Robert E. DeMascio, District Judge.

Argued: December 17, 1999

Decided and Filed: February 25, 2000

Before: NELSON and DAUGHTREY, Circuit Judges;
DOWD, District Judge.[*]

---

[*]The Honorable David D. Dowd, Jr., United States District Judge for
the Northern District of Ohio, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Robert H. Golden, GOLDEN AND KUNZ, Lathrup Village, Michigan, for Appellant. John F. Brennan, CHELI, HESS, Royal Oak, Michigan, for Appellee. **ON BRIEF:** Robert H. Golden, Armand D. Kunz, GOLDEN AND KUNZ, Lathrup Village, Michigan, for Appellant. John F. Brennan, CHELI, HESS, Royal Oak, Michigan, for Appellee.

---

**OPINION**

---

DAVID D. DOWD, JR., District Judge.

## I. Introduction

The false advertising litigation before us has continued for six years, largely due to the paucity of legal rulings available to the trial court on some of the unique issues presented in this case. These issues pertain to the standards for establishing a violation of the Lanham Trade-Mark Act, the relief available once a violation is established, and the method of proofs necessary to establish entitlement to such relief. In particular, this case presents several issues of first impression: (1) whether, upon establishing a violation of the Lanham Act, a plaintiff can recover damage control costs without showing that the false advertising created actual confusion in the marketplace or actual damages in the marketplace; (2) whether a plaintiff can recover damages to goodwill or disgorgement of profits upon showing that an advertisement is literally false or deliberately false, where the plaintiff has no other proof of damages to its business; and (3) whether out-of-state, individual corporate officers who were personally involved in a Lanham Act violation are immune

While it is true that "jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation," *Weller v. Cromwell Oil Co.,* 504 F.2d at 929, we hold that the mere fact that the actions connecting defendants to the state were undertaken in an official rather than personal capacity does not preclude the exercise of personal jurisdiction over those defendants. Hence, where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; *i.e.*, whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). This proposition has been applied by other circuits in the exercise of personal jurisdiction over corporate officers who actively and personally involved themselves in conduct violating the Lanham Act, notwithstanding the fact that the defendants acted as agents when they did so. *See, e.g., Committee for Idaho's High Desert v. Yost,* 92 F.3d 814, 823-24 (9th Cir. 1996); *Electronic Laboratory Supply Co. v. Cullen*, 977 F.2d 798, 807-08 (3d Cir. 1992); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978).

The district court erred in dismissing Case and Morgan from the suit based merely on the fact that they acted as agents for the corporation. The matter will be remanded for a determination of whether their contacts with the state of Michigan were such that due process permits the exercise of personal jurisdiction over them.

## IX.  Disposition

The trial court's ruling on Schmitt's Rule 50 motion is REVERSED and the judgment is VACATED. The case is REMANDED to the district court for further proceedings consistent with this opinion.

from the exercise of personal jurisdiction under the fiduciary shield doctrine.

For the reasons set forth below, we hold: that a plaintiff seeking to recover damage control costs under the Lanham Act for a defendant's false advertising is not required to show that the false advertising created actual confusion or damages in the marketplace; that in order to recover damage to goodwill or disgorgement of profits, a plaintiff must show at least some damage in the marketplace and cannot rely solely on the literal falsehood of an advertisement; and personal jurisdiction may be exercised over corporate agents based upon their minimum contacts with the forum state, as long as personal jurisdiction is not premised on the mere fact of jurisdiction over the corporation.

## II.  Facts and History

Plaintiff-Appellant Balance Dynamics Corporation ("Balance Dynamics"), based in Ann Arbor, Michigan, and Defendant-Appellee Schmitt Industries ("Schmitt"), based in Portland, Oregon, manufacture products that balance industrial grinders and other machines that have a spinning shaft. In a process unique in the industry, Balance Dynamics' product uses a gas called Halon 1202 which is heated and vaporized in one chamber and allowed to condense back to liquid form in another. Schmitt's products accomplish the same result by balancing the spinning shafts with motor driven metal weights.

During the late summer of 1992, prior to Chicago's International Machine Tool Show in September, Schmitt mailed and distributed a postcard cartoon to 2,500 customers or potential customers depicting a "freon balancer" at the top of a "dead wheel balancer bone pile."[1]

---

[1]At the time the cartoon was mailed, Balance Dynamics referred to its product as a "freon balancer." As this appellation took on negative connotations in the wake of increasing environmental awareness, Balance

In late 1992 or early 1993, Schmitt received queries regarding its possible use of halons, freons, or other ozone-depleting materials. On March 16, 1993, Schmitt sent a letter to approximately 3,200 customers and prospective customers stating that

> Effective May 15, 1993, all products which contain or have been processed with ozone depleting substances (ODS) must have warning labels affixed. Subsequently, these substances will be banned from general use. Canada has already banned the substances. The ultimate financial responsibility for environmentally sound disposal of products containing ODS materials will rest with the end user.

After stating that Schmitt's balancing system did not use ozone depleting substances, the letter continued:

> Perhaps because one manufacturer of automatic grinding wheel balancers uses halon, this type of device has come under close scrutiny . . . Should your company operate any halon balancers, and wish to dispose of them prior to May 15, Schmitt Industries can supply an SBS Balance System as an easy replacement.

The letter was signed by defendants Wayne A. Case, Schmitt's president, and James Morgan, Schmitt's sales manager.

In April of 1993, one of Balance Dynamics' largest customers faxed the letter to Thomas Schulte, Balance Dynamics' then-vice president of sales. Schulte consequently spoke with approximately 40 individuals from 12 different corporate customers with regard to the letter. Some of these customer contacts were initiated by Schulte, others by the customers themselves. After investigation, Balance

---

Dynamics began referring to its product as a "halon balancer."

Case and Morgan were acting in their official capacity as agents for Schmitt when they signed the offending letters.

In the seminal case of *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899 (2d Cir. 1981), the fiduciary shield doctrine is formulated as follows: "if an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise, by that state, of jurisdiction over him personally on the basis of that conduct." *Id.* at 902. In that form, the fiduciary shield doctrine prevents the exercise of personal jurisdiction whenever an out-of-state officer's contacts occur by virtue of her official capacity. However, in *Weller v. Cromwell Oil Co.* the doctrine is stated more mildly: jurisdiction over a corporate officer cannot be predicated merely upon jurisdiction over the corporation. 504 F.2d at 929.

Some courts in the Sixth Circuit have followed the *Marine Midland Bank* formulation, holding that the mere fact that an out-of-state defendant performed the alleged tortious or violative conduct while acting as a corporate agent precludes the exercise of personal jurisdiction over that person. *See, e.g., United States v. Flack*, No. 2:96-CV-122, 1997 WL 187373 at *5 (S.D. Ohio January 31, 1997); *Cincinnati Sub-Zero Products, Inc. v. Augustine Medical, Inc.*, 800 F.Supp. 1549 (S.D. Ohio 1992). But other courts have found that the exercise of jurisdiction over the agent depends on the extent of that agent's personal involvement in the conduct. *See, e.g., State of Ohio v. Browning Ferris Indus. Inc.,* No. C 86-7387, 1987 WL 16940 (N.D. Ohio March 26, 1987); *James v. HRP, Inc.,* 852 F.Supp. 620 (W.D. Mich. 1994); *Morton Walker, D.P.M. v. Robert Concoby,* ___ F.Supp.2d ___, 1999 WL 1210871 (N.D. Ohio October 12, 1999). These courts exercised personal jurisdiction over corporate officers where the officers were active participants in the tortious conduct. There is support for this approach in Sixth Circuit case law. *See Chattanooga Corp. v. Klingler,* 704 F.2d 903, 906-07 (6th Cir. 1983); *Serras v. First Tennessee Bank N.A.,* 875 F.2d 1212, 1217 (6th Cir. 1989).

the jury's verdict in favor of Schmitt were sound, the trial court's ruling on the Rule 50 motion would be harmless. However, we agree with Balance Dynamics that the jury instructions were both infirm and prejudicial.

In reviewing the jury instructions of a trial court, an appeals court considers "whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir. 1984). At trial, the court instructed the jury that in order to recover damages relating to a particular letter, Balance Dynamics had to show the following elements: (1) a literally false or a misleading statement of fact regarding plaintiff's product; (2) that the statement actually deceived plaintiff's customer or customers; (3) that the statement actually influenced the purchasing decision of a customer or customers that plaintiff had; (4) a connection to interstate commerce; (5) that plaintiff actually lost a sale or sales from one or more of its customers as a result of defendant's statement. Plaintiff's counsel objected, preserving the issue for appeal. The jury was out for ten minutes before returning a verdict for Schmitt.

Again, the trial court lacked the benefit of *Podiatric Physicians*. That case shows that it is not necessary to show lost sales in order to establish a violation of the Lanham Act, nor is it necessary to establish that customers were actually deceived. Therefore, the jury instructions were erroneous as a matter of law and obviously prejudicial.

## VIII. Dismissal of Defendants Wayne Case and James Morgan

In a November 28, 1994 Order, Judge LaPlata dismissed Schmitt employees Wayne Case and James Morgan on the grounds that the fiduciary shield doctrine frustrated the court's personal jurisdiction over them. Citing *Weller v. Cromwell Oil Co.,* 504 F.2d 927, 929 (6th Cir. 1974), the court found that personal jurisdiction was lacking because

Dynamics confirmed that its halon balancer was not subject to regulation, did not require labeling, and was not slated to be banned. It then responded by making visits to customers and sending a "fact sheet" to those customers who expressed concern.

Schmitt disagreed with certain items in the "fact sheet" and hired an environmental chemist to write an opinion, which stated that Halon 1202 had "managed to slip through the regulatory net" but that it is "quite certain the EPA would regulate its production and use." It also suggested that if the EPA failed to act, a private person could obtain a court order requiring the EPA to list Halon 1202 as a regulated substance, and that "it is almost certain that in the relatively near future Halon 1202 will become very difficult to obtain." The paper was provided to approximately 12 Schmitt customers or prospective customers.

In February of 1994, Balance Dynamics brought suit against Schmitt, Wayne A. Case, and James Morgan, seeking compensatory damages, treble damages, attorney fees, disgorgement of Schmitt's profits, and an injunction restraining Schmitt from similar mailings. Balance Dynamics claimed the defendants had violated various state laws as well as the false advertising language of the Lanham Trade-Mark Act, 15 U.S.C. § 1051 *et seq*. In orders signed by Judge George LaPlata, based on reports and recommendations ("R&Rs") of Magistrate Judge Steven D. Pepe, the district court dismissed Case and Morgan from the suit for lack of personal jurisdiction and dismissed all of Balance Dynamics' state law claims for failure to state a cause of action.

Balance Dynamics dropped its claim for injunctive relief on August 21, 1994. Balance Dynamics also stipulated that it experienced no lost sales, no lost profits, and no increased cost of seeking capital investments. However, Balance Dynamics reserved the right to seek treble damages, Schmitt's profits, damage control costs, and compensation for harm to goodwill. Schmitt then brought a supplemental motion for

summary judgment on Balance Dynamics' damages claims. In August of 1995, Judge LaPlata adopted an R&R granting Schmitt's motion as to lost profits and costs but denying it as to Balance Dynamics' claim for damage control activities.

Judge LaPlata retired in 1996 and the litigation was transferred to Judge Horace W. Gilmore. Judge Gilmore signed an order, purporting to reaffirm an earlier order of Magistrate Judge Pepe, denying Balance Dynamics' punitive damages claim and declaring Balance Dynamics' disgorgement claim moot. Judge Gilmore presided over a trial for several days in April of 1997, but later recused himself and declared a mistrial. The case was then assigned to Judge Robert L. DeMascio, who conducted a trial in August of 1997.

Judge DeMascio bifurcated the trial, with the issue of liability coming first. A three-day jury trial was conducted in which Balance Dynamics called two of its principals (Thomas Schulte and Wayne Winzenz), an expert witness (Dr. Jonathan Nimitz) and the president of Schmitt, Wayne Case. Schmitt called no witnesses, rested and moved for entry of a verdict as a matter of law under Fed.R.Civ.P. 50. The court took the Rule 50 motion under advisement and instructed the jury. Plaintiff's counsel objected to the instructions, preserving the issue for appeal. The court granted Schmitt's Rule 50 motion and the jury returned a finding of no cause of action.

The trial court entered its formal findings of fact, conclusions of law and judgment on September 17, 1997. Balance Dynamics timely filed an appeal from the final judgment and preceding interlocutory orders. Schmitt moved for attorney fees under the provision in the Lanham Act authorizing such awards in "exceptional" cases. The court denied this motion as well as a motion for reconsideration. In a companion case to Balance Dynamics' appeal, Schmitt appealed from these two orders. (Case No. 98-1143).

companies. Engineers know just exactly what those standards are, just exactly what . . . the EPA rulings are . . . frankly I have no idea why this case has been hanging around the court for three and a half years.

Balance Dynamics protests this finding on the grounds that Mr. Schulte had testified that, after the letter was disseminated, some of his customers contacted him in reference to its claims. Schulte further stated that of those companies with whom he had initiated contact, most had received the letter. Schulte testified that his customers told him "they didn't want to necessarily have anything to do with a product that had these stipulations associated with it." He also testified that many customers were concerned about the regulation and disposal of the Balance Dynamics products.

Obviously, the trial court did not have the benefit of an articulated standard for recovery of damage control costs. Under that standard, the testimony above contradicts the trial court's conclusion that Balance Dynamics failed to put on evidence showing the existence of a "fire" to put out. The customer inquiries Balance Dynamics received could be taken as proof of the likelihood of damage, *cf. Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d at 210; *PPX Enterprises, Inc. v. AudioFidelity Enterprises, Inc.*, 818 F.2d at 272, and may suffice to show that the deception was material and likely to influence a purchasing decision. Further, the customer inquiries belie the proposition that Balance Dynamics' customers are so familiar with EPA regulations that Schmitt's communications would not be off-putting. Therefore, this evidence creates a material issue of fact and the trial court should have let the matter go to a jury for determination. *Jackson v. Quanex*, 191 F.3d at 647.

## VII.  Jury Instructions

In a laudable attempt to conserve resources in the event its decision on Schmitt's Rule 50 motion was not sustained on appeal, the trial court allowed the jury to return a verdict. If

considers *de novo* the evidence "in the light most favorable to the non-movant, giving that party the benefit of all reasonable inferences." *Jackson v. Quanex*, 191 F.3d at 657. In ruling on a Rule 50 motion, a trial court is not permitted to "weigh the evidence or make credibility determinations, as these are jury functions." *Id*. A dismissal pursuant to Rule 50 is improper where the nonmovant presents sufficient evidence to raise a material issue of fact for the jury. *Id*.

First, the trial court acknowledged that Balance Dynamics could prove actual confusion by presenting evidence that the Schmitt communications were literally false; but it found that even Balance Dynamics' expert had been unwilling to testify that the Schmitt communications were literally false. Since we have ruled that a showing of literal falsity in this case would not have aided Balance Dynamics in its quest to recover damages to goodwill, there is no need to decide whether the trial court erred in its factual determination that Balance Dynamics presented no evidence of literal falsity.

Second, Balance Dynamics contests the trial court's finding that its damage control activities were an over-reaction to the problem. The trial court made the following factual determinations:

> the evidence really taken as a whole shows what happened here. Plaintiff got a copy of this letter just as Mr. Schulte testified, called a few of his partners together and began to over-react something horrible, and ran out and tried to, quote, put out the fire, when no fire was ever testified to. I don't know what fire the plaintiff is talking about. There was just no fire produced for this Court . . . . That damage that you called loss control is an over-reaction by the Plaintiff that I think the evidence on liability makes it very clear, you didn't even have to do it. You could have handled half of these customers on the telephone, but more importantly his customers included sophisticated engineers at Ford Motor Car Company, the other auto manufacturers and big

### III.  Jurisdiction

The district court correctly exercised federal question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332. Appellate jurisdiction is proper under 28 U.S.C. § 1291.

### IV.  Schmitt's Rule 50 Motion

Rule 50 gives district courts the discretion to grant a motion for judgment as a matter of law "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). An appeals court reviews *de novo* a district court's decision to grant judgment as a matter of law. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). "Without weighing the evidence or assessing the credibility of the witnesses, and after drawing all reasonable inferences in favor of plaintiff, [an appeals court] must determine whether the record contains evidence sufficient to have allowed jurors to find in favor of plaintiff." *Monday v. Oulette*, 118 F.3d 1099, 1101-02 (6th Cir. 1997).

The Lanham Trade-Mark Act provides as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or

geographic origin of his or her or another person's goods, services, or commercial activities
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  The damages to which a plaintiff may be entitled under the Lanham Act are specified in 15 U.S.C. § 1117:

When . . . a violation under § 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

Schmitt made its oral Rule 50 motion at the close of proofs on the grounds that Balance Dynamics had failed to show actual confusion in the marketplace and was therefore not entitled to relief under the Lanham Act.  The district court agreed, finding that Balance Dynamics had not met its "burden of proving that some customer, just one, was confused or changed a purchasing decision, or lost a sale of some kind."

In ruling on Schmitt's Rule 50 motion, the district court did not have the benefit of this circuit's recent decision in *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.,* 185 F.3d 606 (6th Cir. 1999), in which we set forth guidelines for deciding liability for false advertising claims under the Lanham Act.  In *Podiatric Physicians*, which also involved appellate review of a district court's Rule 50 decision, the court established a five-element test for plaintiffs seeking to prove liability under the Lanham Act:

[A] plaintiff must establish the following:  1) the defendant has made false or misleading statements of fact

Balance Dynamics argued that because it could show that Schmitt knowingly and willfully made false statements, it was entitled to disgorgement of profits.  In a closely reasoned R&R, Magistrate Judge Pepe rejected this contention and found that Balance Dynamics was only entitled to disgorgement if it could show that defendant gained additional sales due to the advertisement, or that plaintiff lost sales, or was forced to see its product at a lower price.  As Magistrate Judge Pepe pointed out, § 35(a) of the Lanham Act makes clear that an award of damages shall be "subject to the principles of equity" but also states that the award is to "constitute compensation and not a penalty."  Reviewing the legislative history and case law concerning disgorgement of profits, Magistrate Judge Pepe concluded that unless there is some proof that plaintiff lost sales or profits, or that defendant gained them, the principles of equity do not warrant an award of defendant's profits.  We agree with and adopt Magistrate Judge Pepe's reasoning.[6]

## VI.  Trial Court's Findings of Fact

In granting Schmitt's Rule 50 motion, the trial court made two factual findings that Balance Dynamics contests.  In considering the factual findings that a trial court has made in the context of granting of a Rule 50 motion, a reviewing court

---

[6] We do not believe that the "deterrence theory," in which one of the trial court's primary functions is to make violations of the Lanham Act unprofitable to the infringing party, *See Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 606-07 (6th Cir. 1991) (citing *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989)), supports disgorgement in this case.  As Magistrate Judge Pepe noted, the cases awarding profits under the deterrence theory upon a finding of willfulness or bad faith have been infringement cases "where defendant benefits directly from its wrongful conduct."  *See, e.g., International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 753 (2d Cir. 1996); *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d at 941.  Even in false advertising cases, disgorgement has not been awarded in the absence of harm to the plaintiff or benefit to the defendant.  *See, e.g., U-Haul Int'l v. Jartran, Inc.*, 793 F.2d at 1036.

in the same market." *Id.*; *see also Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 209 fn.8 (9th Cir. 1989).

The reasoning of *Porous Media* is applicable to the present case since Schmitt specifically targeted Balance Dynamics' balancer, which was the only product of its kind in the market. However, as stated above, the evidence shows that Balance Dynamics did not suffer marketplace injury as a result of Schmitt's advertisements. Therefore, even if the advertisements were found literally false and Balance Dynamics presented evidence of willfulness or bad faith, the evidence defeats any presumption of damage to goodwill in the present case.

### C. *Disgorgement*

Balance Dynamics also claims it was improperly precluded from seeking disgorgement of Schmitt's profits. In an April 21, 1997 Order Concerning Damages Available at Trial, Judge Gilmore denied as moot plaintiff's claim for defendant's sales and profits as a measure of damages. Judge Gilmore stated that this claim had already been denied in an October 17, 1996 Order of Judge LaPlata, *id.*,[5] which purportedly adopted Magistrate Judge Pepe's September 27, 1996 R&R on plaintiff's motion in limine regarding punitive damages and defendant's sales. In fact, Judge LaPlata's Order adopts Judge Pepe's August 30, 1995 R&R concerning Balance Dynamics' claims for damages based on *its own* lost sales or lost profits, and it makes no mention of disgorgement of Schmitt's profits. According to Balance Dynamics, the September 27, 1996 R&R concerning disgorgement was objected to but never ruled on. It appears Judge Pepe's September 27, 1996 R&R concerning disgorgement never received *de novo* review of the district court. Consequently, this Court will engage in such a review.

---

[5]Judge LaPlata's Order was actually issued in 1995, not 1996.

concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence a deceived consumers' purchasing decisions; 4) the advertisements were introduced into interstate commerce; 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Id.* at 613 (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 922-23 (3d Cir. 1990); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990).

The second element of the *Podiatric Physicians* test shows that a plaintiff may establish a violation of the Lanham Act without proving actual confusion or a lost sale; that is, a communication that has a "tendency to deceive" can be the subject of a Lanham Act violation if all other elements of the test are met. Hence, the trial court erred in granting Schmitt's Rule 50 motion.

### V.  Available Relief

The posture of this case requires that we examine the forms of relief for which Balance Dynamics may be eligible under the Lanham Act. The granting of Schmitt's Rule 50 motion is harmless error if Balance Dynamics was ineligible for any forms of relief under the Lanham Act. In addition, a remand of this case to the trial court will require a determination as to the relief to be granted. Lastly, the substantial confusion demonstrated in this case underscores the importance of clearly distinguishing the elements necessary to prove a breach of the Lanham Act from the elements necessary to justify a certain remedy for that breach: "the inquiries should be kept separate because a violation of the Lanham Act can be remedied in more ways than one." *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202 (7th Cir. 1990). Here, by not following the *Podiatric Physicians* test for

establishing liability under the Lanham Act, the district court may have "read out of the Lanham Act the remedies that do not rely on proof of injury caused by actual confusion." *Web Printing Controls*, 906 F.2d at 1205.

### A. *Damage Control Costs*

The first form of relief to which Balance Dynamics stakes a claim is that of damage control—the costs of responding to Schmitt's false advertising.[2]  Balance Dynamics argues that it can receive compensation for its damage control activities without showing actual confusion or what are commonly called "actual" damages.  In other words, Balance Dynamics argues that Magistrate Judge Pepe was correct as a matter of law when he recommended denying Schmitt's motion for summary judgment on the issue of loss control.  The R&R that Judge LaPlata adopted states:

> In light of the inquiries made by customers and other business contacts, a factfinder could conclude that plaintiff's actions in response to Schmitt's letter were reasonable attempts to nullify any potential damage to the corporation. A factfinder could also conclude that the letter caused serious risk to plaintiff's future sales and reputation . . . . Unlike plaintiff's claim for lost profits and costs, for purposes of this issue it is irrelevant whether plaintiff *actually* suffered damage through lost or potential sales . . . . Contrary to defendants' assertion, plaintiff's "damage control activities" are recoverable under the Lanham Act, which authorizes an award for *any* damages plaintiff sustains. 15 U.S.C. § 1117(a)(2).

---

[2]*See* Magistrate Judge Pepe's Memorandum Opinion and Order of October 24, 1996 for a summary of damage control activities undertaken by Balance Dynamics.  There is some question as to whether all of Balance Dynamics' claimed damage control losses really related to an effort to mitigate damages from Schmitt's false advertising, or whether Balance Dynamics was simply overreaching and seeking a windfall for activities in which it would have engaged anyway.

*BASF Corp. v. Old World Trading Co.*, 41 F.3d at 1085-88 (finding literal falsity but requiring further proof of marketplace damages); *Castrol, Inc. v. Pennzoil*, 987 F.2d 939, 941-43 (3d Cir. 1993) (affirming trial court decision granting injunctive relief but denying monetary damages despite finding of literal falsity).

### 2. *Deliberate Intent or Bad Faith*

Though literal falsity alone does not raise an inference of damage to goodwill, some courts have created a presumption of damages when literal falsity is accompanied by deliberate intent or bad faith.  The Ninth Circuit reasons that

> the expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived. He who has attempted to deceive should not complain when required to bear the burden of rebutting a presumption that he has succeeded.

*U-Haul Int'l, Inc. v. Jartran, Inc.,*  793 F.2d at 1040-41; *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.,*  926 F.2d 134, 140 (2d Cir. 1991).

In *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329 (8th Cir. 1997), the court followed the Ninth Circuit's reasoning and permitted a presumption of money damages where there existed proof of willful deception.  *Id*. at 1336.  However, acknowledging that a plaintiff seeking monetary relief under the Lanham Act generally must meet a higher level of proof than those seeking injunctive relief, the court clarified the presumptive damages rule as extending only to cases of comparative advertising where the plaintiff's product was specifically targeted.  *Id*. at 1334-35.  Otherwise, stated the *Porous Media* court, "a plaintiff might enjoy a windfall from a speculative award of damages by simply being a competitor

compensate for marketplace injury such as harm to goodwill.[3] A contrary rule would risk conferring an undue windfall on Balance Dynamics. Balance Dynamics presented no evidence that its goodwill was harmed, or that customers were actually deceived by its advertisement.[4] To the contrary, the evidence indicated that Balance Dynamics' business was not harmed by Schmitt's letters. Balance Dynamics' sales increased after the period in question, and there was no decrease in the price of its product. Further, Balance Dynamics admitted that no customers had ever informed it that it was losing a sale due to the Schmitt communications. While literal falsehood or the likelihood of deception may be sufficient to entitle Balance Dynamics to injunctive relief or reimbursement for responsive advertising, it should not permit Balance Dynamics to recover for injuries to goodwill in the absence of some more substantial indication that these injuries actually occurred. *Cf.*

---

[3]Our research uncovered only one case that has awarded damages based merely on the fact that an advertisement was literally false. In *PPX Enterprises, Inc. v. AudioFidelity Enterprises, Inc.,* 818 F.2d 266 (2d Cir. 1987), a record producer falsely labeled eight albums to represent that they contained performances by Jimi Hendrix. Because of the literal falsity of the packaging, the court allowed plaintiffs to prove entitlement to damages without recourse to consumer surveys, witness testimony, or reaction tests. *Id.* at 272-73. The court made clear, however, that this was a special circumstance—the misrepresentation occurred on the product itself, so actual damages were inferable from the fact that the records successfully sold on the market. *Id.* at 272. Such is not the case here.

[4]Customer inquiries were taken as evidence of actual damage to goodwill in *Criticare Systems, Inc. v. Nellcor Inc.,* 856 F.Supp. 495 (E.D. Wisc. 1994), where an allegedly false letter was presented at a conference, prompting audience members to "press [plaintiff] to explain [the false] allegations during the remainder of the conference and afterwards." *Id.* at 507. From these inquiries, the court opined that a jury could reasonably conclude that the plaintiff had lost business and suffered depletion of goodwill in the marketplace. *Id.* at 508-09. But we rejected this approach in *Podiatric Physicians*, where we held that a letter of inquiry may have demonstrated some confusion but did not show that the customer was "tricked into believing an untruth about plaintiff." 185 F.3d at 617.

---

But for Schmitt's letter, plaintiff would not have incurred any expenses because it would not have had to take any corrective action. Therefore, the cost of plaintiff's response activities, if found reasonable and necessary by a jury, constitute 'damage' under the Lanham Act."

(emphases in original).

On the other hand, Schmitt relies on *Electronics Corp. of America v. Honeywell*, 358 F.Supp. 1230 (D.Mass. 1973), to suggest that damage control costs are not recoverable in the absence of actual confusion or "actual" damages. In *Electronics Corp. of America*, plaintiff had waived any attempt to show so-called "actual business harm" in dollars and cents but nevertheless pressed its case for damages, punitive damages, costs, and attorney fees. *Id.* at 1233. The court held that the plaintiff could not recover in the absence of "actual business harm." *Id.* at 1234.

Like many other circuits, we have held that where plaintiffs seek to recover monetary damages for false or misleading advertising that is not literally false, "a violation can only be established by proof of actual deception (i.e., evidence that individual consumers perceived the advertisement in a way that misled them about the plaintiff's product)." *Podiatric Physicians,* 185 F.3d at 614 (quoting *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222, 229 (3d Cir. 1990)) (citations omitted). In *Podiatric Physicians*, we also set forth a more lenient standard for obtaining injunctive relief under the Lanham Act: "injunctive relief may be obtained by showing only that the defendant's representations about its product have a tendency to deceive consumers . . . ." *Id.* at 618 (quoting *Max Daetwyler Corp. v. Input Graphics, Inc.,* 608 F.Supp. 1549, 1551 (E.D. Pa. 1985)). "This lower standard has arisen because when an injunction is sought, courts may protect the consumer without fear of bestowing an undeserved windfall on the plaintiff." *Id.*

Although *Podiatric Physicians* held that recovery of monetary damages is only available upon a showing of actual confusion, the question of the standard upon which damage control costs may be recovered is one of first impression. None of the courts requiring actual confusion as a prerequisite to monetary recovery have applied that rule to limit recovery for damage control activities; their opinions simply were not written to take account of that kind of damages. Rather, when courts have held that actual confusion must be demonstrated before monetary damages are recoverable, they have referred to plaintiffs who were seeking damages that would have been suffered in the marketplace, i.e., lost sales, lost profits, or loss of goodwill. *See, e.g., Web Printing Controls, Inc.,* 906 F.2d at 1204-05 (plaintiff wishing to recover damages for a violation of the Lanham Act must prove "actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill)."); *Podiatric Physicians*, *supra*; *PPX Enterprises, Inc. v. AudioFidelity Enterprises, Inc.,* 818 F.2d 266 (2d Cir. 1987); *Electronics Corp. of America v. Honeywell*, *supra*.

Actual confusion is a prerequisite to an award of such "marketplace damages" because actual confusion tends to show that these hard-to-prove damages probably exist. Yet there is no need to use such proxies with regard to damage control expenses, for the proof of such expenses is in the possession of the plaintiff and is therefore easily produced. Hence, there seems little reason to require "actual confusion" before awarding compensation for damage control expenses, even though such an award is "monetary." As Magistrate Judge Pepe noted, the plain language of the Lanham Act permits recovery of "any damages sustained by the plaintiff" upon a showing that the plaintiff is or is likely to be damaged by misrepresentative advertising. 15 U.S.C. §§ 1125(a), 1117. Magistrate Judge Pepe's view is reinforced by *Podiatric Physicians*, which allows a plaintiff to establish liability under the Lanham Act by showing that a false advertisement has a tendency to deceive a substantial portion of the audience, and that it has caused harm to the plaintiff. 185 F.3d at 613.

deliberate intent or bad faith does not entitle Balance Dynamics to recover money for damages to goodwill.

### 1. *Literal Falsity*

Because proof of "actual confusion" can be difficult to obtain, *Lindy Pen Co. Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), most of the circuits have ruled that when a statement is literally false, a plaintiff need not demonstrate actual customer deception in order to obtain relief under the Lanham Act. However, the "literal falsity" rule has never permitted a plaintiff to recover marketplace damages without other proof that such damages occurred. Rather, this rule has been stated in suits in which the plaintiff sought injunctive relief, *see, e.g., United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1180 (8th Cir. 1998); *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1389 (5th Cir. 1996); *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991); *cf. Federal Trade Commission v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985); or literal falsity was not found, *see, e.g., Podiatric Physicians,* 185 F.3d at 614-18; *C.B. Fleet Co., Inc. v. Smithkline Beecham Consumer Healthcare, L.P.,* 131 F.3d 430, 434 (4th Cir. 1997); or marketplace damages were not awarded under the Lanham Act, *see, e.g., Rhone-Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.,* 93 F.3d 511, 516 (8th Cir. 1996); *Avila v. Rubin,* 84 F.3d 222, 227 (7th Cir. 1996); or literal falsity was accompanied by other proof of marketplace damages. *See, e.g., BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1085-88 (7th Cir. 1994); *U-Haul Int'l v. Jartran, Inc.*, *supra*.

At trial, Balance Dynamics attempted to show that Schmitt's advertisements were literally false. But the above cases demonstrate that literal falsity, without more, is insufficient to support an award of money damages to

unwillingness to irk customers as the plaintiff pursues proof of harm.

Therefore, because a company may justifiably act before it actually sustains injury, standards similar to those applicable to injunctive relief are appropriate where plaintiffs seek to recover damage control expenses. Hence, to recover loss control damages, plaintiffs must show that a violation of the Lanham Act occurred, and that (1) there was a likelihood of confusion or damages to sales, profits, or goodwill; (2) its damage control expenses are attributable to the violation (i.e., caused by the violation); and (3) that its damage control efforts were reasonable under the circumstances and proportionate to the damage that was likely to occur.

### B. *Damage to Goodwill*

Although Balance Dynamics stipulated that it suffered no lost sales or change in financial condition, it reserved the right to seek, *inter alia*, damages to its goodwill. To recover for damage to goodwill, the plaintiff bears the burden of proof. *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d at 1204-05; *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 47 F.Supp.2d 523, 533 (D.N.J. 1999). Schmitt contends that Balance Dynamics offered no evidence that its goodwill or reputation within the industry was actually damaged by Schmitt's communications. But Balance Dynamics presented evidence of the literal falsity of the Schmitt advertisements and also contended that Schmitt violated the Lanham Act with deliberate intent and bad faith. Though the "actual confusion" rule would ordinarily preclude Balance Dynamics' claim for goodwill, in certain circumstances the literal falsity of an advertisement or evidence of deliberate intent or bad faith has sufficed to entitle a plaintiff to certain forms of relief or to create a presumption of damages in the marketplace. The trial court seems to have acknowledged this in stating that literal falsity could prove the existence of actual confusion. However, we hold that in the present case, evidence of literal falsity and

Damage control expenses must be treated differently from marketplace damages because, like an injunction, damage control is undertaken precisely to prevent such things as lost sales, lost profits, and lost goodwill. As is the case with plaintiffs seeking injunctive relief, plaintiffs engaging in damage control are still at a stage where substantial uncertainty exists as to the extent of "business harm" being inflicted by the false advertising. *Cf. ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949, 952 (D.C. Cir. 1993). In the present case, Balance Dynamics first heard about Schmitt's March 16, 1993 letter when *a customer* faxed it to Mr. Schulte. The letter contained disparaging remarks which, if true, would ruin Balance Dynamics' business. Not yet knowing whether the letter was true or false, Schulte called his most important customers and found that most of them had received the letter and were concerned about the regulations pertaining to the halon balancer. Meanwhile, other customers initiated contact with Mr. Schulte or other officers of Balance Dynamics, and also expressed serious reservations about the continued use of the halon balancer. Balance Dynamics then investigated the veracity of the claims made in the letter and found they were false.

At this point, with 3,200 letters in circulation, must Balance Dynamics wait to take action until a customer actually tells someone at Balance Dynamics that she will not buy the halon balancer? Is Balance Dynamics limited to seeking injunctive relief to stop future letters being mailed out, when 3,200 people are reading statements about the halon balancer that, if believed, will be fatal to Balance Dynamics' business? At such a juncture, an injunction may be a mere palliative. We think it appropriate that Balance Dynamics, upon recognizing the reasonable likelihood of confusion, would undertake to protect its business. *Cf. ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d at 952. We also think it appropriate that Schmitt, having violated the Lanham Act and thereby being responsible for "any damages" caused by such violation, should compensate Balance Dynamics for any reasonable and

necessary expenses incurred in mitigating the detrimental effects of that transgression. *Id.*

Consequently, similar standards as apply to injunctive relief should also apply to recovery of damage control expenses. That is, damage control expenses should be recoverable upon a showing of the likelihood of actual confusion, rather than upon a showing of actual confusion itself. This rule recognizes that it is unreasonable to expect a businessperson faced with a Lanham Act violation to sit idly by until a customer manifests actual confusion. The law should encourage quick responses and the mitigation of damage, and should not require parties to suffer an injury before trying to prevent it. Moreover, a rule allowing recovery for damage control costs upon the likelihood of actual confusion does not risk an "undeserved windfall" to the plaintiff since such an award would not speak to the underlying marketplace damages. *Cf. Podiatric Physicians,* 185 F.3d at 618.

Distinct from Schmitt's argument that damage control costs are not recoverable without a showing of actual confusion is its assertion that damage control costs are not recoverable in the absence of "actual damages" or, we assume, marketplace damages. But we find that argument similarly unacceptable. No court has excluded damage control costs from its definition of damages that are considered "actual." And several courts have awarded damages for the expense of responsive or reparative advertising quite apart from an award of marketplace damages. *See, e.g., ALPO Petfoods, Inc. v. Ralston Purina Co., supra*; *U-Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1041 (9th Cir. 1986); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 745 (7th Cir. 1985). Although none of these courts have awarded damage control costs in the absence of marketplace damages, none have treated marketplace injury as a prerequisite to recovery of damage control costs either. Moreover, a rule that predicated recovery of damage control expenses on a showing of marketplace damages would penalize successful efforts at mitigating damages. That is, under such a rule, a plaintiff who is successful in preventing marketplace damages would not be able to recover under the Lanham Act, but a plaintiff who is unsuccessful would be permitted to recover. That would be an anomaly.

We also note that the practical realities of business litigation favor a rule that damage control costs should be recoverable even where plaintiffs do not demonstrate actual confusion or marketplace injury. For one, marketplace damages and actual confusion are notoriously difficult and expensive to prove. *See PPX Enterprises, Inc. v. AudioFidelity Enterprises, Inc.,* 818 F.2d at 272-73; *U-Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d at 1041. More importantly, however, even where marketplace damages or actual confusion are provable in theory, such proof often requires that a plaintiff solicit its own customers for affidavits, which puts the customers at risk of being subpoenaed by the defendant. Plaintiffs are justifiably hesitant to alienate or upset their customers in this way. In addition, plaintiffs may hesitate to put marketplace damages at issue because that would entitle a defendant to discover information about plaintiff's business. As may have been the case here, oftentimes the rational business decision is for a plaintiff to embark on a campaign of damage control and forego a demonstration of injury in the marketplace or actual confusion of their customers. Such a plaintiff should not be required to give up compensation for its damage control expenses when the defendant's wrongful action necessitated those expenses in the first place.

Nor should plaintiffs who are unwilling or unable to prove marketplace damages or actual confusion be limited to seeking injunctive relief. An injunction can halt a wrongful activity but it will not correct its effects. Responsive advertising may be the quickest, most effective way to mitigate damages or prevent them altogether. Further, limiting a plaintiff to injunctive relief is especially unfair where a plaintiff's inability to prove marketplace damages or actual confusion may merely reflect an understandable